# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-00670-SCT

*PRENTISS COLEMAN a/k/a PRENTISS COLEMAN, III a/k/a LITTLE BRO a/k/a BA BRO*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR CORRECTION OF OPINION

| | |
|---|---|
| DATE OF JUDGMENT: | 10/20/1997 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | W. RICHARD JOHNSON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | G. GILMORE MARTIN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/17/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/7/2002 |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The Motion for Correction of Opinion is granted. The opinions previously issued in this case are withdrawn, and these opinions are substituted therefor. The mandate in this case shall issue forthwith.

¶2. In May 1995, Prentiss Coleman, III was indicted in the Circuit Court of Warren County for the capital murder of Melanie Straughter. The indictment charged that on or about December 18, 1994, Coleman did break and enter the dwelling house of Angela Tillman in the night with an ax with the intent to commit the crime of murder. The case was tried to a jury on October 13-17, 1997, in Warren County Circuit Court. Instructions were given for capital murder and murder. On October 17, 1997, the jury returned a verdict of "guilty of capitol [sic] murder." Following the sentencing hearing, the jury was given instructions for the penalties of death and life imprisonment without parole. The jurors, however, were unable to agree upon a sentencing verdict. Therefore, the court sentenced Coleman to life imprisonment without the possibility of parole. Coleman's Motion for Judgment Notwithstanding the Verdict or Alternatively a New Trial was denied. Thereafter, this appeal was taken.

## FACTS

¶3. Melanie Straughter ("Melanie"), the victim, had known Prentiss Coleman III ("Coleman"), the defendant, for about two years. Coleman moved into Melanie's apartment at 105 Athens Avenue in Vicksburg, Mississippi, and cohabitated with Melanie and her two young children. In November of 1994, Melanie attempted to break off the relationship. Thereafter, Coleman moved his things out of Melanie's house.

¶4. After Melanie broke off the relationship, Coleman refused to let go of her. There were several instances of assault and abuse by Coleman, and Melanie filed several citizen complaint reports against Coleman. On December 9, 1994, ten days before Melanie's death, Coleman was found guilty of two counts of simple assault, malicious mischief, and trespassing.

¶5. According to Melanie's mother, during this time, Melanie was "scared, very scared" and "was in constant fear." Her mother and her work supervisor, Sidra Burns, stated that Melanie was afraid to do anything alone due to her fear of Coleman. She stayed with family members or had Sidra Burns stay with her. She was afraid to drive to work by herself or to even leave work for lunch. Sidra Burns's testimony indicates the extent of Melanie's fear of her former boyfriend:

> I could see the expressions on her [Melanie's] face whenever his [Coleman's] name was mentioned or sometimes in the latter part of November when she actually became afraid of him and screeched when he came around.

> [H]e would come in late hours in the evening and sit at her desk, and I could actually see her body trembling from the back side of the office. . . And I knew that something was wrong when I entered the office and Prentiss would be there. And she would be shaking and I would then make an excuse to pull her out of the office to get her out.

> She filed, she went to the police station and filed charges whenever he would be around and she would be frightened. Usually I would be with her or perhaps one of her other friends. But she would-on instanced [sic] where she would be coming to work in the mornings and he would be following her to work. . . I went with her every afternoon home to feed the dog because she was afraid to go home by herself. . . I went home with her in the evenings; went through her house with her to make sure that he was not anywhere around. . .

> It was so frequent and continuous. . . his stalking her, following her. . . His, just constant appearing in places, always behind her, always around, lurking, and her fear of him.

¶6. Charles Jones, the maintenance supervisor of the subdivision where Melanie lived, also knew that Melanie and Coleman were involved in a volatile relationship. In early December 1994, she asked him about changing the locks in her house. Also, she asked him to follow her when she drove from work to pick up her children and go home. About a week before she was murdered, Melanie bought a .25 automatic pistol, and Jones showed her how to operate it. After Jones showed Melanie how to handle the pistol and left her house, he decided to drive back by her house to check on her safety. As he neared her house, he heard "a lot of screaming" and called the police on his car phone. According to Jones, "the door had been ripped open and Mr. Coleman was standing there with a piece of door casing in his hand where the door had been kicked in." After this incident, Melanie called Jones on other occasions when she became fearful of Coleman.

¶7. The State's witnesses describe the series of events that occurred on Sunday, December 18, 1994, as follows. On that afternoon, Melanie acted and sang in a church play. Her mother, children, and Coleman were in the audience. Melanie's mother testified that after the play, Melanie took her children to dinner.

¶8. Angela Tillman, Melanie's next-door neighbor of two years, had seen Prentiss Coleman lurking about Melanie's home earlier in the day on December 18. She called Randy Nailor, a detective for the Vicksburg

Police Department. Detective Nailor told Angela to watch for Melanie to come home and to call him back if Melanie did not want to enter her house alone, and he would send somebody to escort her in the house.

¶9. Later that night, Angela looked out her window and saw Melanie's car with the driver's door open and the parking lights on. Angela asked Trey Dudley, Angela's cousin who lived with her, to go over to Melanie's house with her. Before they could leave their front porch, Trey heard Coleman scream, "Bitch, I'm going to kill you" and saw Melanie start running. He also heard a gunshot, but did not know its origin. Melanie ran towards Angela Tillman's house and yelled, "please help me, please help me. Call 911." Angela turned around and ran into the house to call the police.

¶10. Angela and Melanie ran into a back bedroom. Meanwhile, Trey was fastening and locking the door when Coleman "kicked it in." With an ax in his hand, Coleman stood over Trey and angrily demanded to know where Melanie was. Angela ran to the closet, trying to hide. According to Angela, Coleman then knocked the door down on top of Melanie and had the ax in his hand. Coleman pulled Melanie by the hair in the hallway and "started hitting her and chopping her all in the face and her neck." Angela then jumped out of the window to get some help.

¶11. Angela's portrayal of the events on the night of December 18, 1994, was corroborated by other members of her household. Trey Dudley saw Coleman drag Melanie by her hair out into the hall and raise the ax. He turned to run, but as he was going out the door he "heard the licks." Melanie was still screaming after the first blow, but after the second one, Trey did not hear anything. James Tillman, Angela's brother, saw Coleman with the ax, heard screaming, and heard "one, like one chop." Carrie Tillman, who also lived with Angela, was in the kitchen when Coleman came into the house. She came out of the kitchen and saw Coleman pull Melanie out of the bedroom by her hair and begin "hitting on her, cut her face and neck." When he stopped hitting Melanie with the ax, he stood over her and said, "I had to do it Melany. I had to do it."

¶12. Vicksburg police officer Daniel Watts was told by Detective Nailor that Coleman was a suspect. He and Officer Dan King went to Coleman's' house. Officer Watts found Coleman, his mother, his brother, and several other family members at the house. Watts arrested Coleman. As Watts was putting on the handcuffs, Coleman said, "She done me wrong." Officer King transported Coleman to jail, and Officer Watts remained at the residence and interviewed Coleman's brother, Michael Butler. Butler told him that Coleman said that she had done him wrong, handed him an ax, and he dropped it to the ground. Butler showed him the ax, and Watts seized it for evidence.

¶13. On Wednesday, December 14, 1994, four days before the Melanie was killed, Coleman asked Detective Nailor to watch while he removed his belongings from Melanie's house. Nailor observed Coleman load and move two truckloads of belongings from the house. Specifically, Nailor saw Coleman remove the ax from the kitchen and walk to the front of the house with it. Coleman's purpose that day was to remove his belongings from Melanie's house, and Coleman identified the ax as his. Nailor identified the ax found at the crime scene as the one he saw Coleman take from Melanie's house on December 14.

¶14. Coleman's version of the events differed from that of the State. According to Coleman, he and Melanie accidentally met at the bank after the play, and she promised to pick him up dinner and meet with him. When Coleman arrived at Melanie's house, the two children were directed to bed while the adults talked. According to Coleman, Melanie became bitter and pulled a gun from her coat. Melanie backed Coleman at gun point out of the house. In his testimony, Coleman stated that Melanie shot at him, but missed. He has no

recollection of the events that transpired after Melanie fired the gun.

¶15. Coleman admits he should "take the blame" for Melanie's death. However, in his testimony, he stated that he did not know where the ax came from that killed Melanie. He testified that it was usually kept under the sink at Melanie's house. Coleman said that he did not have it with him when he came to the house and did not know how it got there.

¶16. The coroner, L.W. Calloway, testified that there were a number of chop wounds to Melanie's face, lower jaw, and neck. Additionally, her right index finger had been traumatically amputated, and she had two very deep wounds in the brain area of the skull. The cause of death, according to Calloway, was severe head trauma due to or as a consequence of chop wounds to the head and neck.

¶17. The following issues are before this Court:

**I. WHETHER THE NOTICE OF APPEAL WAS TIMELY FILED AFTER THE GRANT OF AN OUT-OF-TIME APPEAL?**

**II. WHETHER THE TRIAL COURT ERRED IN GIVING INSTRUCTION S-2A?**

**III. WHETHER THE TRIAL COURT CORRECTLY REFUSED TO GIVE A "HEAT OF PASSION MANSLAUGHTER INSTRUCTION"?**

## ANALYSIS

### I.

¶18. The circuit court denied Coleman's motion for a judgment notwithstanding the verdict or, alternatively, for a new trial on November 17, 1997. Apparently a dispute arose between Coleman and his trial attorneys, and rather than file a timely notice of appeal, they sought leave to withdraw. Although the circuit judge first denied the motion to withdraw, later, on March 31, 1998, he granted that relief and appointed new counsel for the appeal. On December 10, 1998, no notice of appeal having been filed by the new counsel, the judge, sua sponte, granted an out-of-time appeal. He did not, however, specify a time for filing of the notice, and it was only filed March 30, 1999-almost four months after the out-of-time appeal was granted and a year following ruling on the post-trial motion.

¶19. Although, the State points out the fact that Coleman's notice of appeal was not filed within the time allowed by Miss. R. App. P. 4, it did not file a motion to dismiss or otherwise argue the issue.

¶20. The Rules of Appellate Procedure require that an appeal be filed within thirty days after the trial court has ruled on the post-trial motions. Miss. R. App. P. 4(a), (d). Although the rules make provision for an extension to be granted in the trial court, such extension must be granted upon motion filed within thirty days after the expiration of the time otherwise allowed, and the extension is not to exceed the longer of thirty days beyond the prescribed time or ten days from the date on which the extension was granted. Miss. R. App. P. 4(g). No provision is made authorizing the trial court, sua sponte or on motion filed in the trial court to thereafter grant an out-of-time appeal.

¶21. Prior to *Jones v. State*, 346 So. 2d 376 (Miss. 1977), out-of-time appeals were unknown in our practice. However, there the remedy of a petition for out-of-time appeal in criminal matters was recognized.

Soon thereafter, in a related decision, the Court held that the petition should be filed with this Court, that it would be remanded for hearing, and that an out-of-time appeal should be granted "where a person is convicted of a crime and through no fault of his own is effectively denied his right to perfect his appeal within the time prescribed by law by the acts [or omissions] of his attorney or the trial court." *Jones v. State*, 355 So. 2d 89, 90 (Miss. 1978). See also, *Diggs v. State*, 784 So. 2d 955 (Miss. 2001) (recognizing that one convicted of a crime may be granted an out-of-time appeal where the failure to timely appeal was not his fault, but affirming the trial court's denial where testimony of trial counsel refuted the allegations); *Wilson v. State*, 426 So. 2d 792 (Miss. 1983).

¶22. There can be no doubt that Coleman's appeal arrives in this Court through imperfect procedures. His first attorneys failed to timely appeal, and after new counsel was appointed, still, no appeal was filed until the trial judge entered an order allowing an out-of-time appeal. Even then, it was filed only after almost four months passed. Coleman did not file a petition for out-of-time appeal, and whether the trial court had authority to remedy the failure to appeal by the sua sponte order entered after the time set by the rules for filing a notice of appeal had expired is doubtful. It certainly is not the remedy contemplated by *Jones.* Nevertheless, when justice demands, this Court has not been grudging in granting out-of-time appeals in criminal cases. *Fair v. State*, 571 So. 2d 965, 966 (Miss. 1990).

¶23. When justice demands, the Court will suspend its rules under Miss. R. App. P. 2(c). While Rule 2(c) provides that the time for taking an appeal will not be extended in civil cases, it does not impose a like prohibition as to criminal appeals. Although the record is not clear, it appears that the circuit judge found that the delays in Coleman's case were not of his own fault and attempted expediently to remedy the loss of his right to appeal. For that reason, because this case involves important issues of public policy, recognizing that some of the delay was likely caused by the failure of the order granting the out-of-time appeal to specify a filing deadline, and, finally, observing that the State chose not to contest the issue, we now exercise our authority to suspend the rules under Rule 2(c) and consider this appeal on its merits.

## II.

¶24. Coleman alleges that the trial court erred in granting instruction S-2A because it was confusing and an incorrect statement of the law. Jury instructions "[a]re to be taken collectively rather than be given individual consideration. So long as all the instructions read together adequately and properly instruct the jury on the issues, an individual instruction given to the jury will not constitute reversible error." *Detroit Marine Eng'g v. McRee*, 510 So.2d 462, 467-68 (Miss. 1987). Under *Heidel v. State*, 587 So.2d 835 (Miss. 1991), a court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Id.* at 842.

¶25. Instruction S-1 instructed the jury that in order to convict the defendant of capital murder it would have to find from the evidence in this case beyond a reasonable doubt that Coleman (1) did willfully, feloniously, and with or without deliberate design, kill Melanie Straughter, a human being; (2) without authority of law; (3) when engaged in the crime of burglary of an occupied dwelling at night while armed with a deadly weapon. Instruction S-2A provided, in pertinent part:

> The Court instructs the Jury that the crime of capital murder is the killing of a human being while engaged in the commission of the crime of burglary of an occupied dwelling at night while armed with a deadly weapon. In order *to find the Defendant guilty of capital murder as defined in instruction S-1, you must find from the evidence in this case beyond a reasonable doubt*

*that:*

1. Prentiss R. Coleman, III, on or about December 18, 1994, in Warren County, Mississippi,

2. did break and enter at night

3. the dwelling house of Angela Tillman and others located at 107 Athens Avenue,

4. which was occupied at that time by Angela Tillman and others, and

5. Prentiss R. Coleman, III, was armed with an ax,

6. which is a deadly weapon, and

7. entered with the intent to commit the crime of murder.

(emphasis added).

¶26. Instruction S-1 informed the jury that in order to convict Coleman of capital murder it would have to find from the evidence that Coleman killed Melanie while engaged in the crime of burglary. The language in the instruction tracked the requirement of the felony capital murder statute. *See* Miss. Code Ann. § 97-3-19 (2000). Instruction S-2A supplemented S-1 by instructing the jury as to the elements of the predicate crime of burglary. *See* Miss. Code Ann. § 97-17-23 (2000). It specifically referred the jury back to S-1 for the definition of capital murder. Contrary to Coleman's allegations, instruction S-2 was not another definition of capital murder; rather, it was a definition of burglary. Instruction S-1 states that burglary must be found from the evidence, and instruction S-2A sets out the elements of the offense of burglary.

¶27. Although S-2A could have been worded more clearly to indicate it was an instruction on the elements necessary to constitute burglary, this Court finds that such an error is harmless and does not constitute reversible error. "An instructional error will not warrant reversal if the jury was fairly and fully instructed by other instructions." ***Collins v. State***, 594 So.2d 29, 35 (Miss. 1992) (citing ***Laney v. State***, 486 So.2d 1242, 1246 (Miss. 1986)). Coleman has not shown that the jury was not fully instructed as to all of the elements of felony capital murder and as to all the elements of the underlying felony. Indeed, the elements of capital murder and burglary are fully set out. Therefore, the jury was properly informed, and this issue is without merit.

### III.

¶28. Coleman's primary defense in this case is heat-of-passion manslaughter. Although he never denied that he killed Melanie, he alleges that he was unable to remember all the details of the offense. Coleman contends that he was acting in responsive rage to the aggression of the victim as she attempted to shoot him. The trial court first announced that a manslaughter heat-of-passion instruction would be given, but later refused such instructions after deciding that the facts of the case did not warrant the giving of such an instruction. Coleman argues that the refusal of his requested manslaughter instructions, D-8 and D-9, constitutes reversible error.

¶29. Because Coleman killed Melanie during the commission of a burglary, he was not entitled to a manslaughter instruction. Miss. Code Ann. § 97-3-27 (2000) provides:

> The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony *except those felonies enumerated in Section 97-3-19(2)(e) and (f),* or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

(emphasis added). Burglary is one of the felonies listed in Miss. Code Ann. § 97-3-19(2)(e) that is excepted by the manslaughter statute. In a case similar to the one at bar, this Court held that a defendant who killed a victim during the commission of rape and armed robbery was not entitled to manslaughter instruction. *Blue v. State*, 674 So.2d 1184, 1201 (Miss. 1996), *overruled on other grounds, King v. State*, 784 So. 2d 884 (Miss. 2001). The Court reasoned that like burglary, rape and robbery are also felonies excepted by the manslaughter statute. 674 So. 2d at 1201.

¶30. Coleman was charged with a felony excepted by the manslaughter statute, burglary of Angela Tillman's home. Moreover, the evidence at trial was clear that Coleman committed burglary. Coleman admitted in his statement at the police station that he broke down the front door of Angela Tillman's home. Trey Dudley testified that he heard Coleman yell out at Melanie in the yard, "Bitch, I'm going to kill you." Melanie ran inside the home screaming "please help me, call 911." He also testified that he closed and locked the door of the house, and Coleman kicked in the door. Coleman entered brandishing an ax demanding to know Melanie's location in the house. Coleman knocked a door down on Melanie, dragged her by the hair and started chopping her in the face and neck. When the trial court judge refused the manslaughter instructions, he reasoned, "the facts are uncontradicted, even by Mr. Coleman, himself, that there was a breaking and entering of 107 Athens Drive." Clearly, Coleman broke into the house and entered with the intent to kill Melanie.

¶31. In sum, the trial court did not commit reversible error by refusing the manslaughter instructions. This Court has previously held that if the killing was committed during the commission of one of the enumerated felonies in Miss. Code Ann. § 97-3-12(2)(e), one of which is burglary, capital murder is proven and the defendant is not entitled to a manslaughter instruction. *Blue*, 674 So.2d at 1201. The evidence is clear. Melanie Straughter was murdered during the commission of a burglary of Angela Tillman's home.

## CONCLUSION

¶32. For these reasons, the trial court did not err in granting Instruction S2A and refusing Coleman's requested manslaughter instructions. Therefore, the judgment of the Warren County Circuit Court is affirmed.

¶33. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

 **PITTMAN, C.J., WALLER, COBB, DIAZ AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. CARLSON, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE AND SMITH, P.JJ., WALLER, COBB AND EASLEY, JJ.**

 **CARLSON, JUSTICE, CONCURRING:**

¶34. I agree with the conclusion reached by the majority. I write separately to address the manner in which

this case got to this Court.

¶35. Without doubt, the majority correctly opines that this case deserved to be considered and ultimately decided on its merits. No legitimate purpose would be served in the case sub judice by a dismissal of this appeal based on the failure to timely perfect an appeal. When a defendant has been convicted of capital murder and sentenced to a term of life imprisonment without the benefit of parole, and that defendant, as here, indicates in any way a desire to appeal the conviction and sentence, that defendant should be entitled to have at least one appellate court review the proceedings in the trial court.

¶36. According to the majority opinion, new counsel was appointed for Coleman on March 31, 1998, and by December 10, 1998, some two hundred fifty-four (254) days later, no notice of appeal had been filed. On December 10, 1998, the learned trial judge, obviously being possessed with a sense of fairness and resolve to have cases decided on their merits and not dismissed because of procedural non-compliance by attorneys, sua sponte granted an out-of-time appeal. Even with that reprieve from the trial court, appointed counsel waited until March 30, 1999 -- another one hundred ten (110) days -- before filing a notice of appeal. The fact that the trial judge, at the time of granting an out-of-time appeal, failed to specify a time for filing a notice of appeal is absolutely of no moment. The lawyer, without any tutoring from the trial judge, should have been diligent in adhering to the applicable rules. "Thirty days" ought to be etched into the brain of every lawyer who anticipates an appeal in a criminal or civil case from the trial courts of this state to this Court.

¶37. The *Mississippi Rules of Appellate Procedure* (M.R.A.P.), offer unequivocal guidance to a lawyer desiring an appeal in this state. M.R.A.P. 3(a) states in pertinent part:

> An appeal permitted by law as of right from a trial court to the Supreme Court shall be taken by filing a notice of appeal with the clerk of the trial court within the time allowed by Rule 4.

M.R.A.P. 4(a) states in pertinent part:

> Except as provided in Rules 4(d) and 4(e), in a civil or criminal case in which an appeal or cross-appeal is permitted by law as of right from a trial court to the Supreme Court, the notice of appeal required by Rule 3 shall be filed with the clerk of the trial court within 30 days after the date of entry of the judgment or order appealed from.

Certainly relevant here is M.R.A.P. 4(e), which provides that the thirty (30) day period in a criminal case shall commence to run from the entry of the order denying post-trial motions or the imposition of sentence, "whichever occurs later." Finally, M.R.A.P. 4(g) grants the trial court authority to extend the time for filing a notice of appeal, even ex parte, for good cause shown, if such motion for extension of time is filed within the initial thirty (30) day period, or upon a showing of excusable neglect after notice to all parties, if such motion for extension of time is filed after the initial thirty (30) day period, but within the time as specified by M.R.A.P. 4(g).

¶38. Since court-appointed counsel obviously made no effort to comply with any of these rules, by the time the trial court took its action, sua sponte, that court had long since lost jurisdiction to extend the time for the filing of a notice of appeal, pursuant to the M.R.A.P., whether it be by motion of the defendant, or on the trial court's own motion. By the time December 10, 1998, rolled around with no notice of appeal in sight, the only recourse available to "right an obvious wrong" would have been for the defendant and/or his court

appointed counsel to file a post-conviction relief ("PCR") motion pursuant to the legislatively enacted Mississippi Uniform Post-Conviction Collateral Relief Act," Miss. Code Ann. §§ 99-39-1 et seq. (2000 & Supp. 2001). No doubt, had Coleman's counsel or Coleman, pro se, filed a PCR motion requesting an out-of-time appeal pursuant to Miss. Code Ann. § 99-39-5(h) (Supp. 2001), Judge Patrick would have unhesitatingly granted relief. This fact is obvious because Judge Patrick, in an effort to understandably "right the wrong" as expeditiously as possible, granted such relief, sua sponte. In fact, Judge Patrick's actions, in the end, caused Coleman's case to reach this Court for a decision on the merits much quicker, via this Court's appropriate suspension of its rules pursuant to authority granted under M.R.A.P. 2(c). However, neither Judge Patrick nor this Court should have been placed in this situation by way of having to "bend" and suspend rules in order that a defendant could have his case decided on its merits. A very learned law professor once said that lawyers should strictly adhere to three (3) basic principles if they are going to properly and effectively represent their clients in court: "(1) Show up for court. (2) Show up for court, on time. (3) Show up for court, on time, prepared."

¶39. In this case, Coleman's lawyer failed to show up for court on time, and in fact waited until a year after appointment before he performed a very basic act - filing a one-page notice of appeal. If those desiring an appeal will read and follow M.R.A.P. 3(a), 4(a), 10(b)(1), & 11(b)(1), they most likely will be in good shape when it comes to getting their cases properly before this Court.

¶40. In sum, based on the facts and circumstances peculiar to this particular case, as reflected by the procedural history given by the majority, the proper procedure to have been followed would have been for a PCR motion for an out-of-time appeal to be filed in the trial court pursuant to Miss. Code Ann. § 99-39-5(h). However, I certainly can find no fault in the majority's suspension of the rules in order to have the case decided on its merits as expeditiously as possible. In the end, justice was served, and not only was an expeditious resolution of this case on its merits fair to the defendant, it was also fair to Melanie Straughter's family members and friends.

¶41. All of this having been said, I agree with the majority as to the appropriate disposition of this case. The record reveals that a properly instructed jury appropriately found from the credible evidence that Coleman committed the most despicable act that one human being can commit against another human being. There was certainly no reversible error committed, and Coleman's conviction for the capital murder of Melanie Straughter and sentence of life imprisonment without parole should be affirmed.

**McRAE AND SMITH, P.JJ., WALLER, COBB AND EASLEY, JJ., JOIN THIS OPINION.**